**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| PARKER SCHOOL UNIFORMS, LLC, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Case No. 18-10085 (CSS) |
| _____ | ) | |
| JEOFFREY L. BURTCH, | ) | |
| CHAPTER 7  TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro. No.  (CSS) |
| | ) | |
| | ) | |
| ARGOSY INVESTMENT PARTNERS V, L.P., | ) | |
| AND ARGOSY INVESTMENT PARTNERS | ) | |
| PARALLEL V, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT TO AVOID TRANSFERS AND/OR OBLIGATIONS**
**PURSUANT TO 11 U.S.C. §§ 544, 547, 548 AND 6 DEL. C. §§ 1304 AND 1305**
**TO RECOVER PROPERTY TRANSFERRED PURSUANT TO 11 U.S.C. § 550 AND**
**TO RECHARACTERIZE CERTAIN DEBTS AS EQUITY**

Jeoffrey L. Burtch, Chapter 7 Trustee (the "Trustee" and/or "Plaintiff") for the

bankruptcy estate (the "Estate") of Parker School Uniforms, LLC ("Parker" or the "Debtor"),

Plaintiff in this adversary proceeding, by his undersigned attorneys, in support of this complaint

(the "Complaint") to avoid and recover preferential and constructively fraudulent transfers and

obligations against Argosy Investment Partners V, L.P. and Argosy Investment Partners Parallel

V, L.P. (collectively "Argosy" and/or the "Defendants"), and to recharacterize certain

subordinated notes as equity, hereby alleges upon information and belief that:

## NATURE OF THE CASE

1.        Pursuant to sections 547, 548, 544, and 550 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and sections 1304(a)(2), 1305(a), and 1305(b) of Chapter 13 of Title 6 of the Delaware Code, 6 Del.C. 1301 *et seq.* (the "Delaware Code"), this Complaint seeks to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made, all preferential and fraudulent transfers of property made to or for the benefit of Defendants by the Debtor during the applicable ninety-day, one-year, two-year, and four-year periods prior to the filing of the Debtor's bankruptcy petition. This Complaint further seeks the recharacterization to equity of certain alleged debts of Debtor owed to Defendants. The transfers that the Plaintiff seeks the avoidance and recovery total an amount not less than $515,918.73 (collectively, the "Transfers").[1]

2.        To the extent that Defendants have filed a proof of claim, or has otherwise requested payment from the Debtor or the Estate (collectively, the "Claim"), this Complaint is not intended to be, nor should it be construed as, a waiver of the Plaintiff's right to object to such Claim for any reason, including, but not limited to, 11 U.S.C. § 502(a) through (j) of the Bankruptcy Code, and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to 11 U.S.C. § 502 may be sought by the Plaintiff herein and as further stated below.

---

[1] The defined term "Transfers" includes the "One-Year Transfers", the "548 Transfers" and the "Del. C. Transfers" each defined *infra*. and are set forth on the Exhibit A filed herewith and incorporated by reference.

## JURISDICTION

3.    This Court has subject matter jurisdiction over this adversary proceeding, which arises under Title 11, arises in, and relates to a case under Title 11, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 18-10085 (CSS) (the "Bankruptcy Case"), pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.

4.    In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff hereby states that it consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.    The statutory and legal predicates for the relief sought herein are Sections 502, 544, 547, 548, and 550 of the Bankruptcy Code, and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.    This adversary proceeding is a "core" proceeding to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. § 157(b)(2) and the Bankruptcy Court may enter final orders for the matters contained herein.

7.    Venue is proper in the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

8.    Nationwide service of process by first-class mail postage prepaid is available pursuant to Bankruptcy Rule 7004(b) and (d).

## PROCEDURAL HISTORY AND BACKGROUND

9.      On January 12, 2018 (the "Petition Date"), Parker School Uniforms, LLC commenced this Bankruptcy Case, by filing a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

10.     On or about January 16, 2018, Jeoffrey L. Burtch was appointed as chapter 7 interim trustee in the Bankruptcy Case. On February 15, 2018, a meeting of creditors was held pursuant to Section 341 of the Bankruptcy Code (the "341 Meeting").[2] The 341 Meeting was continued and ultimately concluded on March 23, 2018. Mr. Burtch continues to serve as the Trustee pursuant to Section 702(d) of the Bankruptcy Code.

11.     Prior to the Petition Date, Parker operated a distribution center and warehouse facility in Houston, TX, as well as approximately forty-seven (47) retail stores in ten (10) states for the sale of school uniforms.

12.     The ninety-day period prior to the Petition Date is from October 14, 2017 through January 12, 2018 (the "Preference Period").

13.     The one-year period prior to the Petition Date applicable to insiders pursuant to 11 U.S.C. § 547(b)(4)(B) and 6 Del. C. §1305(b) is from January 13, 2017 through January 12, 2018 (the "Insider Preference Period").

14.     The two-year period prior to the Petition Date is from January 13, 2016 through January 12, 2018 (the "548 Transfer Period").

15.     The four-year period prior to the Petition Date is from January 13, 2014 to January 12, 2018 (the "Delaware Code Four Year Transfer Period").

---

[2] Excerpts of the *Transcript of 341 Meeting of Creditors of Mark Gillis Dated February 15, 2018* ("341 Meeting Transcript") are attached hereto as Exhibit B and incorporated by reference.

16.     Upon information and belief, Argosy Investment Partners V, L.P.:

(a)      is a limited partnership of the state of Delaware;

(b)     has its principal place of business located in Wayne, PA;

(c)     has a mailing address at 950 West Valley Road, Suite #2900, Wayne, PA 19087-1845;

(d)     Argosy Associates V, LLC, is its general partner, with Donald Charlton V.P. and CFO of the general partner;

(e)     National Registered Agents, Inc. is its registered agent, and may be served with process at 160 Greentree Dr., Suite 101, Dover, Delaware, 19904; and

(f)     was either a statutory or non-statutory insider of the Debtor, pursuant to 11 U.S.C. § 101(31)(B) and/or (C) and 6 *Del. C.* §1301(7)(b) and/or (c); and/or 6 *Del. C.* §1301(1).

17.     Upon information and belief, Argosy Investment Partners Parallel V, L.P.:

(a)     is a limited partnership of the state of Delaware;

(b)     has its principal place of business located in Wayne, PA;

(c)     has a mailing address at 950 West Valley Road, Suite #2900, Wayne, PA 19087-1845;

(d)     Argosy Associates Parallel V, LLC, is its general partner, with Richard C. Schwenk, Jr., V.P. and CFO of its general partner;

(e)     National Registered Agents, Inc. is its registered agent, and may be served with process at 160 Greentree Dr., Suite 101, Dover, Delaware, 19904; and

(f)     was either a statutory or non-statutory insider of the Debtor, pursuant to 11 U.S.C. § 101(31)(B) and/or (C) and 6 Del. C. §1301(7)(b) and/or (c); and/or 6 Del. C. §1301(1).

## FACTUAL BACKGROUND

18.     On June 9, 2015, Salem Investment Partners III, Limited Partnership ("Salem LP") formed PSU Holdings, LLC ("PSU Holdings"), a Delaware limited liability company, for the purpose of investing in, and soliciting investments for, the purchase of all membership interests in the Debtor.

19.     Effective June 9, 2015, Salem LP was the sole member and owner of one hundred percent (100%) of PSU Holdings.

20.     On or about June 25, 2015, PSU Holdings purchased the outstanding units of Parker School Uniforms, LLC from Blue Sage Capital, L.P. ("Blue Sage"), Shuford Interests, L.P., KMS Family Holdings, Inc., Troy Pike ("Pike"), Mike Porter ("Porter"), Barbara Cohen, Bobbie Kopkin, and Jon Stevens (collectively, the "Sellers") for cash consideration of $20,601,750 (the "June 25, 2015 Sale").

### The PSU Holdings Investment Agreement

21.     On June 25, 2015, PSU Holdings and the following investors (the "Investors") entered into an investment agreement (the "Investment Agreement")[3] regarding PSU Holdings and Parker: Salem LP, Argosy Investment Partners V, L.P. ("Argosy Partners"), Argosy

---

[3] A copy of the "Investment Agreement among PSU Holdings, LLC, Salem Investment Partners III, Limited Partnership, Argosy Investment Partners V, L.P., Argosy Investment Partners Parallel V, L.P., Plexus Fund III, L.P., and Plexus Fund QP III, L.P" is attached hereto as Exhibit C.

Investment Partners Parallel V, L.P. ("Argosy Parallel")[4], Plexus Fund III, L.P. ("Plexus L.P."), and Plexus Fund QP III, L.P. ("Plexus QP")[5].

22.     Pursuant to section 2.1 of the Investment Agreement, PSU Holdings was authorized to sell to the Investors of its senior subordinated promissory notes (the "Subordinated Notes") in the aggregate principal amount of $13,500,000.

23.     Pursuant to section 2.2 of the Investment Agreement, PSU Holdings was authorized to issue to the Investors 1,160,000 Class B Units.

24.     Pursuant to section 2.3 (Purchase and Sale of Subordinated Notes) and 2.4 (Issuance of Class B Units) of the Investment Agreement, each of the Investors agreed to purchase Subordinated Notes, and be issued Class B Units, from PSU Holdings as set forth in the Schedule 1 of the Investment Agreement, as set forth immediately below[6]:

| Investor | Subordinated Notes | Class B Units |
|---|---|---|
| Argosy Partners | $1,388,899.50 | 115,913 |
| Argosy Parallel | $111,100.50 | 9,272 |
| Plexus L.P. | $3,000,000.00 | 250,370 |
| Plexus QP | $3,000,000.00 | 250,370 |
| Salem LP | $6,000,000 | 500,741 |
| **TOTALS:** | **$13,5000,000** | **1,126,666** |

---

[4] To the extent not otherwise defined herein, "Argosy" shall have the meaning as set forth in the Investment Agreement and shall include, collectively, Argosy Partners and Argosy Parallel.

[5] To the extent not otherwise defined herein, "Plexus" shall have the meaning as set forth in the Investment Agreement and shall include, collectively, Plexus L.P., and Plexus QP.

[6] Argosy, Plexus, and Salem LP are sometimes referred to herein as the "Subordinated Note Holders".

25.     The issuance of Class B units was in proportion to the amount of Subordinated Notes purchased.

26.     Pursuant to section 2.10 of the Investment Agreement, all indebtedness of PSU Holdings to any Investor was to be guaranteed jointly and severally by the Guarantors, as evidenced by and subject to the terms of guaranties in form and substance satisfactory to the Investors.[7]

27.     Pursuant to section 2.12 of the Investment Agreement, the Subordinated Notes were to be subordinated to the Senior Indebtedness to the extent set forth in the Intercreditor Agreement (as those terms are defined in the Investment Agreement.)

28.     Pursuant to section 6.16(b) of the Investment Agreement, "[t]he Company shall permit one authorized representative of each of Salem, Plexus and Argosy (and their successors) to attend and participate in all meetings (including any executive session thereof) of its board of directors or managers, as applicable, and any committee thereof, whether in person, by telephone or otherwise."

29.     Pursuant to section 8.1 of the Investment Agreement, all payments under any Subordinated Note shall be payable by draft from PSU Holdings' checking account.

---

[7] Per the Investment Agreement, "Guarantors" is defined as the Subsidiary Guarantors.

"Subsidiary Guarantors" is defined as "collectively or individually as the context may indicate, each Subsidiary who from time to time becomes a party to the Subsidiary Guaranty Agreement on or after the Closing Date."

"Subsidiary Guaranty Agreement" is defined as the Subsidiary Guaranty Agreement made by each Subsidiary in favor of the Investor Agent (as defined in the Subordination Agreement) for the benefit of itself and the other Investors.

**The Amended PSU Holdings LLC Agreement**

30.    On June 25, 2015, PSU Holdings and its members, consisting of Investors Salem LP, SIP III Holdings, Inc. ("Salem Holdings" together with Salem LP, "Salem"),  Plexus L.P., Plexus QP, Argosy Partners, Argosy Parallel, as well as Pike, Porter, Susen Sarpa ("Sarpa"), and Allison Balthrope ("Balthrope")[8], executed the Amended and Restated Limited Liability Company Agreement of PSU Holdings, LLC, dated June 25, 2015 ("PSU Holdings LLC Agreement" a copy of which is attached as <u>Exhibit D</u>).

31.    Pursuant to section 3.2 of the PSU Holdings LLC Agreement, "[t]he name of each Holder, the number and class of Units issued to each Holder, the Percentage Interest, and Capital Contribution of each Holder as of the date of this Agreement are as set forth on the Unit Register" attached as Exhibit A to the PSU Holdings LLC Agreement (the "Original Unit Register"). The Original Unit Register reflects the following:[9]

| Investor | Class/Number of Units | Percent Interest | Capital Contributions |
|---|---|---|---|
| Salem LP | Class A: 1,801,696 Class B: 500,741 | 21.91% | $1,801,696.00 |
| Salem Holdings | Class A: 278,304 | 2.53% | $278,304.00 |
| Plexus LP | Class A: 520,000 Class B: 250,370 | 6.99% | $520,000.00 |
| Plexus QP | Class A: 520,000 Class B: 250,370 | 6.99% | $520,000.00 |
| Argosy Partners | Class A: 4,333,366 Class B: 115,913 | 40.40% | $4,333,366.00 |
| Argosy Parallel | Class A: 346,634 Class B: 9,272 | 3.23% | $346,634.00 |

---

[8] The PSU Holdings LLC Agreement specifies that Pike, Porter, Sarpa, and Balthrope are "Management Members."

[9] The "Percent Interest" amounts set forth in the Original Unit Register totals 101%.

| Investor | Class/Number of Units | Percent Interest | Capital Contributions |
|---|---|---|---|
| Pike | Class A: 300,000<br>Incentive: 901,333 | 10.91% | $300,000.00 |
| Porter | Class A: 100,000<br>Incentive: 197,167 | 2.70% | $100,000.00 |
| Sarpa | Class A: 125,000<br>Incentive: 169,000 | 2.67% | $125,000.00 |
| Balthrope | Class A: 125,000<br>Incentive: 169,000 | 2.67% | $125,000.00 |
| **Total Class A:**<br>**Total Class B:**<br>**Total Incentive:** | **8,450,000**<br>**1,126,667**<br>**1,436,500** | | **Total Capital:**<br>**$8,450,000.00** |

32.     Pursuant to section 3.3 of the PSU Holdings LLC Agreement, "[e]ach Class A Holder as of the date hereof shall make a Capital Contribution to the Company in the form of cash and/or other assets in exchange for the Class A Units specified for such Holding on [the Original Unit Register]."

33.     Pursuant to section 4.3 of the PSU Holdings LLC Agreement, Salem was entitled to elect and appoint two members of the PSU Holdings board of managers (the "Board"). Adam Norris and Meredith Jolly were initially appointed by Salem.

34.     Pursuant to section 4.3 of the PSU Holdings LLC Agreement, Argosy was entitled to elect and appoint two members of the Board. Keven P. Shanahan and Lane W. Wiggers were initially appointed by Argosy.

**The Amended and Restated Limited Liability Agreement of Parker School Uniforms LLC**

35.     On June 25, 2015, Parker and PSU Holdings entered into and executed the Amended and Restated Limited Liability Agreement of Parker School Uniforms LLC (the "Parker LLC Agreement").

36.      Pursuant to the Parker LLC Agreement, PSU Holdings, LLC was the sole member.

37.     The Parker LLC Agreement appointed the following persons as the initial officers of Parker:

    a.  Pike         President
    b.  Porter       Vice President of Sourcing and Secretary
    c.  Sarpa        Vice President of Merchandising
    d.  Balthrope   Vice President of Sales & Marketing

38.     Pike executed the Parker LLC Agreement as President of both PSU Holdings and Parker.

**Frost Bank Senior Debt and Subordination Agreement**

39.     On January 14, 2011, Parker and Frost Bank ("Frost Bank") entered into the "Amended and Restated Loan Agreement dated January 14, 2011" (as amended, supplemented or otherwise modified, the "Frost Loan Agreement" and/or "Frost Bank $20,000,000 Senior Facility").

40.     On or about December 1, 2012, Frost Bank made a loan to Parker under the Frost Loan Agreement evidenced by a promissory note executed by Parker and payable to the order of Frost Bank in the original principal amount of $20,000,000.00 (the "Frost Note"). The Frost Note was a renewal and extension of a series of promissory notes dating back to 2008.

41.    The Frost Note was secured by a Commercial Security Agreement, dated August 7, 2008 (the "Frost Security Agreement") executed by Parker as grantor and for the benefit of Frost Bank.

42.    On June 25, 2015, in conjunction with the June 25, 2015 Sale, Frost Bank and Parker entered into "Amendment No. 5 to Amended and Restated Loan Agreement." (the "5th Frost Amendment," a copy of which is attached hereto as Exhibit E).

43.    Pursuant to paragraph 1 of the 5th Frost Amendment, on June 25, 2015, the outstanding principal balance of the Borrowing Base Line of Credit was $16,351,079.00, with $2,837,222.00 available for drawing.

44.    Pursuant to paragraph 2(b) of the 5th Frost Amendment, the fourth and fifth paragraphs of Section 1(a) of the Frost Loan Agreement were deleted, and the following paragraphs were substituted:

> An amount of eighty percent (80%) of the Borrower's Eligible Accounts, plus an amount equal to eighty percent (80%) of the Borrower's Eligible Inventory from February 1st to August 15th each year, and sixty percent (60%) of the Borrower's Eligible Inventory during the period from August 16th to January 31st each year.

> […]

> As used herein, the term "Eligible Inventory" shall mean as of any date, the aggregate value of all inventory of raw materials and finished goods (excluding work in progress and packaging materials, supplies and any advertising costs capitalized into inventory) then owned by Borrower and held for sale, lease or other disposition in the ordinary course of its business, in which Lender has a first priority lien, **excluding (i) inventory which is damaged, defective, obsolete or otherwise unsaleable in the ordinary course of Borrower's business**. . . [emphasis supplied].

45.    On June 25, 2015, in conjunction with the June 25, 2015 Sale, Frost Bank and PSU Holdings entered into a Guaranty Agreement (the "PSU Guaranty") whereby PSU Holdings guaranteed all indebtedness, obligations, and liabilities of Parker to Frost Bank under the Frost Loan Agreement, Frost Note, and the Frost Security Agreement.

46.    On June 25, 2015, in conjunction with the June 25, 2015 Sale, Parker, PSU

Holdings, the Subordinated Note Holders, and Frost Bank entered into the "Subordination,

Intercreditor and Negative Pledge Agreement" (the "Subordination Agreement," a copy of which

is attached hereto as Exhibit F).

47.    Pursuant to section 6.2 of the Subordination Agreement:

Until the Senior Loan Termination Date, and notwithstanding anything to the
contrary contained in the Subordinated Note Documents, the Subordinated Note
Holders shall not, without the prior written consent of Frost Bank, agree to any
amendment, modification or supplement to the Subordinated Note Documents the
effect of which is any of the following: (a) increase the maximum principal
amount of the Subordinated Notes Obligations to exceed $13,500,000.00. . .

**The Dixon Hughes Audit**

48.    On or about May 10, 2017, Dixon Hughes Goodman LLP ("Dixon Hughes")

issued its "PSU Holdings, LLC and Subsidiary Consolidated Financial Statements" (the "Dixon

Hughes Financial Statement" or "DHFS," a copy of which is attached hereto as Exhibit G) for

the years 2016 and 2015.

49.    Pursuant to the Dixon Hughes Financial Statement, effective June 25, 2015, PSU

Holdings purchased the outstanding units of Parker for cash consideration of $20,601,750 (the

"Purchase Price"). DHFS, p. 9. The purchase was funded with the funds raised via the equity

investment of $8,450,000 and subordinated debt of $13,500,000. DHFS, pp.11-2, 14.

50.    Pursuant to the Dixon Hughes Financial Statement:

On June 25, 2015, the Company entered into five subordinated term notes with
members. All notes accrue interest at an annual rate of 11% plus the deferred
interest rate of 1.5% for an aggregate rate of 12.5%. Interest is payable in arrears
on the first day of each month through the maturity date in June 2020, at which
time the full principal balance shall be due along with any accrued but unpaid
interest. The notes are subordinated to the revolving line of credit and contain
covenants with respect to certain financial ratios, with which the Company was in
compliance at December 31, 2016 and 2015. The balance on these notes was
$13,816,194 and $13,607,227 at December 31, 2016 and 2015, respectively,
which includes $13,500,000 of principal as of December 31, 2016 and 2015 and

13

$316,194 and $107,227 of unpaid deferred interest as of December 31, 2016 and 2015, respectively.

*DHFS*, p. 11.

51.    Pursuant to the Dixon Hughes Financial Statement:

On June 16, 2016, the Company entered into six subordinated term notes with members. All notes accrue interest at an annual rate of 11% plus the deferred interest rate of 1.5% for an aggregate rate of 12.5%. Interest is payable in arrears on the first day of each month through the maturity date in June 2017, at which time the full principal balance shall be due along with any accrued but unpaid interest. The notes are subordinated to the revolving line of credit and contain covenants with respect to certain financial ratios, with which the Company was in compliance at December 31, 2016. The balance on these notes was $1,000,097 at December 31, 2016, which includes $991,956 of principal and $8,141 of unpaid deferred interest.

*DHFS*, p. 12.

52.    According to the Dixon Hughes Financial Statement, the interest expense under all subordinated notes was $1,809,228 and $893,565 (unaudited) for the year ended December 31, 2016 and the period from June 25, 2015 through December 31, 2015, respectively. *DHFS*, p. 12.  The total subordinated debt as of December 21, 2016 as set forth in the Dixon Hughes Financial Statement was $14,403,119.

53.    Pursuant to the Dixon Hughes Financial Statement, on June 25, 2015, Parker issued 8,450,000 of Class A units at a price of $1 per unit, totaling $8,450,000, of which $8,350,000 was paid in cash. *DHFS*, p.14.

54.    Pursuant to the Dixon Hughes Financial Statement, on June 25, 2015, Parker also issued 1,126,666 Class B units and 1,436,500 Incentive units for $0. *DHFS*, p. 14.

55.    Pursuant to the Dixon Hughes Financial Statement, during the year ended December 31, 2016, Parker issued 1,885,001 Class A units for $1,885,000 in cash. Parker also issued 225,334 Incentive units for $0. *DHFS*, p. 14.

56.     Pursuant to the Dixon Hughes Financial Statement, the tangible and identifiable assets acquired and liabilities assumed were recognized at their estimated fair values as of the acquisition date, with the excess of consideration over the estimated fair values of the net assets acquired allocated to goodwill. *DHFS*, p. 10.

57.     The tangible and intangible assets and liabilities identified in the Dixon Hughes Financial Statements include:

a.  Inventory in the amount of $27,117,532;
b.  Line of Credit liability in the amount of $16,057,079; and
c.  Goodwill in the amount of $10,537,021.

*DHFS*, p. 10.

58.     The Dixon Hughes Financial Statement states that as of December 31, 2015, total assets of $34,665,514, and total liabilities of $23,503,071. *DHFS*, p. 3.

59.     The Dixon Hughes Financial Statement states that as of December 31, 2015, Parker had inventory valued at $22,849,397, with a reserve of obsolete inventory in the amount of $1,693,727, leaving a total inventory value totaling $21,155,670. *DHFS*, p. 10.

60.     The Dixon Hughes Financial Statement states that as of December 31, 2016, total assets of $37,301,549, and total liabilities of $28,195,099. *DHFS*, p. 16.

61.     The Dixon Hughes Financial Statement indicated as of December 31, 2016, there was $22,738,084 in inventory, with a reserve of obsolete inventory of $135,110, leaving a total inventory amount of $22,602,974. *DHFS*, p. 10.

62.     The Dixon Hughes Financial Statement indicated as of December 31, 2016, for the fiscal year ending December 31, 2016, PSU Holdings and Parker had an audited net loss of ($2,698,317). *DHFS*, p. 16.

63.     The Dixon Hughes Financial Statement states:

***Basis for Disclaimer of Opinion on Results of Operations and Cash Flows***

The Company's accounting records did not permit us to extend our auditing procedures to obtain sufficient evidence about inventory costs and quantities on June 25, 2015, stated at $27,117,532. The amount of the inventory at June 25, 2015, materially affects the determination of the results of operations and cash flows for the period from June 25, 2015 (inception) through December 31, 2015.

*DHFS*, p. 2.

### Amendment No. 7 to Frost Loan Agreement

64.     On December 27, 2016, Frost Bank and Parker entered into the Amendment No. 7 to Amended and Restated Loan Agreement and Modification, Renewal and Extension Agreement (the "7th Frost Amendment"). *See* [D.I. 23-1, pp. 15-28.][10]

65.     Pursuant to the 7th Frost Amendment, the outstanding principal of the Frost Note on December 27, 2016 was $12,015,992.00.

66.     The 7th Frost Amendment provided that the second paragraph of Section 1(a) of the Loan Agreement shall be replaced with the following (the "Loan Rest Covenant"):

During the period beginning on the date of Amendment No. 7 and ending October 31, 2017, Borrower covenants and agrees that (i) there shall be a period of at least fourteen (14) consecutive days during which (a) there are no Borrowing Base Advances outstanding and  (b) no Borrowing Base Advances will be made; and (ii) there shall be a period of at least thirty (30) consecutive days during which there are no Borrowing Base Advances that exceed $2,000,000.

67.     The 7th Frost Amendment provided that Section 6(c) of the Loan Agreement is to be deleted and replaced with:

(c)     Conditions Precedent to Effectiveness of Amendment No. 7. As a condition precedent to the effectiveness of Amendment No. 7 and as a condition precedent to the Lender's obligation to continue to make Borrowing Base Advances to Borrower, Borrower agrees to cause its equity to be increased by no

---

[10] [D.I. __] citations refer to filings in the Bankruptcy Case, Bankr. Case No. 18-10085.

less than $1,385,000 on or prior to the date Amendment No. 7 is signed by the parties thereto.

68.     Upon entry into the 7th Frost Amendment, Parker's liquidity and access to credit was greatly curtailed and reduced.

69.     Upon entry into the 7th Frost Amendment, Parker and PSU Holdings was required to invest additional equity to maintain the use of the Frost Loan.

70.     Upon information and belief, the $1,385,000 in additional funded equity as required under the amended Section 6(c) was for the purpose a partial pay-down on the outstanding Frost Loan. No additional monies were funded as cash to Parker.

**First Additional Advances of Alleged Credit to Parker**

71.     On June 14, 2016, Parker, PSU Holdings, and Frost Bank entered into the First Amendment to Subordination, Intercreditor and Negative Pledge Agreement (the "Amended Subordination Agreement"). *See* [DI 23-1, p. 17.]

72.     The Amended Subordination Agreement permitted the Investors and Salem Holdings to increase the amount of the Subordinated Notes.

73.     On June 16, 2016, Argosy Parallel, an equity insider, lender and creditor, advanced Parker $39,535.00 under a subordinated note, and Argosy Partners, an equity insider, lender, and creditor, advanced Parker $494,482.00 under a subordinated note (collectively the "Argosy 2016 Subordinated Notes").   *See* [D.I. 3], Schedule of Assets and Liabilities (the "Schedules") Schedule E/F, Part 2, 3.3 and 3.6.

74.     On June 16, 2016, Salem LP, an equity insider, lender, and creditor, advanced Parker $255,931.00 under a subordinated note, and Salem Holdings, an equity insider, lender, and creditor, advanced Parker $30,898.00 under a subordinated note (collectively the "Salem 2016 Subordinated Notes").   *See* [D.I. 3], Schedule E/F, Part 2, 3.17 and 3.21.

75.     On June 16, 2016, Plexus LP, an equity insider, lender, and creditor, advanced Parker $85,555.00 under a subordinated note, and Plexus QP, an equity insider, lender, and creditor, advanced Parker $85,555.00 under a subordinated note (collectively the "Plexus 2016 Subordinated Notes").  *See* [D.I. 3], Schedule E/F, Part 2, 3.11 and 3.14.

### Second Additional Advances of Alleged Credit to Parker

76.     On November 8, 2017, Argosy Parallel funded Parker via a "subordinated note" in the amount of $20,578.00, and on November 8, 2017, Argosy Partners funded Parker via "subordinated note" in the amount of $257,256.00 (collectively the "Argosy Nov. 2017 Notes"). *See* [D.I. 3], Schedule E/F, Part 2, 3.4 and 3.7

77.     On November 8, 2017, Salem LP funded Parker via "subordinated note" in the amount of $123,482.00, and on November 17, 2017, Salem LP funded Parker via "subordinated note" in the amount of $400,000, (collectively the "Salem LP Nov. 2017 Notes"). *See* [D.I. 3], Schedule E/F, Part 2, 3.16 and 3.19.

78.     On November 8, 2017, Plexus LP and Plexus QP each funded Parker via "subordinated notes" each in the amount of $30,871.00, (collectively the "Plexus Nov. 2017 Notes"). *See* [D.I. 3], Schedule E/F, Part 2, 3.12 and 3.15

### Additional Advances of Alleged Equity to Parker

79.     Upon information and belief, during the second quarter of 2016, Don Van der Wiel ("Van der Wiel")[11] was retained as Chief Financial Officer of Parker. In conjunction with Van der Wiel's hire, Van der Wiel invested $500,000 in PSU Holdings in exchange for 500,000 units of Class A units in PSU Holdings.

---

[11] Argosy, Salem, Plexus, Pike, Porter, Sarpa, Balthrope and Van der Wiel are all Parker insiders (individually and collectively the "Parker Insiders")

80.     Pursuant to the 7th Frost Amendment, Parker and PSU Holdings, through its Investors, were required to invest an additional $1,385,000 in equity as a condition precedent to obtaining financing.

81.     Upon information and belief, on or about December 15, 2016, Salem, Plexus, Argosy, Pike, Sarpa, and Balthorpe collectively invested an additional $1,385,001 in exchange for 1,385,001 additional Class A units of PSU Holdings, as follows:

| Investors | 2016 Class A Units Issued |
|---|---|
| Salem LP | 300,257 |
| Salem Holdings | 46,380 |
| Plexus LP | 86,659 |
| Plexus QP | 86,659 |
| Argosy Partners | 722,166 |
| Argosy Parallel | 57,767 |
| Troy Pike | 46,425 |
| Michael Porter | 0 |
| Susen Sarpa | 19,344 |
| Allison Balthrope | 19,344 |
| **Total 2016 Class A:** | **1,385,001** |

**The Parker/PSU Holdings Petition Date Capital Structure**

82.    The PSU Holdings' unitholders, effective December 2016, are as follows:

| | 2015 Class/Number of Units Issued | 2016 Class A Units Issued | Total Units | Percentage of Equity |
|---|---|---|---|---|
| Salem LP | Class A: 1,801,696<br>Class B: 500,741 | Class A: 300,257 | Class A: 2,101,953<br>Class B: 500,741 | 20.34% |
| Salem Holdings | Class A: 278,304 | Class A: 46,380 | Class A: 324,684 | 3.14% |
| Plexus LP | Class A: 520,000<br>Class B: 250,370 | Class A: 86,659 | Class A: 606,659<br>Class B: 250,370 | 5.87% |
| Plexus QP | Class A: 520,000<br>Class B: 250,370 | Class A: 86,659 | Class A: 606,659<br>Class B: 250,370 | 5.87% |
| Argosy Partners | Class A: 4,333,366<br>Class B: 115,913 | Class A: 722,166 | Class A: 5,055,532<br>Class B: 115,913 | 48.92% |
| Argosy Parallel | Class A: 346,634<br>Class B: 9,272 | Class A: 57,767 | Class A: 404,401<br>Class B: 9,272 | 3.91% |
| Troy Pike | Class A: 300,000 | Class A: 46,425 | Class A: 346,425 | 3.35% |
| Michael Porter | Class A: 100,000 | Class A: 0 | Class A: 100,000 | 0.97% |
| Susen Sarpa | Class A: 125,000 | Class A: 19,344 | Class A: 144,344 | 1.4% |
| Allison Balthrope | Class A: 125,000 | Class A: 19,344 | Class A: 144,344 | 1.4% |
| Don Van der Wiel | Class A: 0 | Class A: 500,000 | Class A: 500,000 | 4.84% |
| **Total Class A:**<br>**Total Class B:** | **8,450,000**<br>**1,126,667** | **1,385,001**<br>**0** | **10,335,001**<br>**1,126,667** | |

83.    The PSU Holdings' Subordinated Noteholders, including amounts alleged to have been advanced pursuant to additional "subordinated notes" in November of 2017, effective as of the Petition Date, are as follows:

| Investor | Subord. Notes (eff. 6.25.15) | Class B Units (eff. 6.25.15) | Subord. Notes (eff. 6.16.16) | Subord. Notes (eff. 11.8.17) | Subord. Notes (eff. 11.17.17) |
|---|---|---|---|---|---|
| Argosy Partners | $1,388,899.50 | 115,913 | $494,482.00 | $257,256 | 0 |
| Argosy Parallel | $111,100.50 | 9,272 | $39,535.00 | $20,578 | 0 |
| Plexus L.P. | $3,000,000.00 | 250,370 | $85,555.00 | $30,871 | 0 |
| Plexus QP | $3,000,000.00 | 250,370 | $85,555.00 | $30,871 | 0 |
| Salem LP | $6,000,000 | 500,741 | $255,931.00 | $123,482 | $400,000 |
| Salem Holdings | 0.00 | 0 | $30,898.00 | 0 | 0 |
| **TOTALS:** | **$13,5000,000** | **1,126,666** | **$991,956** | **$463,058** | **$400,000** |

**Parker's Excessive Obsolete Inventory**

84.    According to the 341 Meeting testimony of Mark Gillis ("Gillis"), a member of Salem that sat on the Parker Board, prior to the June 25, 2015 Sale, seller Blue Sage had assured the Investors that the inventory on the books at the time of the June 25, 2015 Sale was usable inventory. *341 Meeting Transcript*, pp. 32-33.

85.    However, Gillis explained at the 341 Meeting how over the many years of Parker's operations, the company accumulated inventory that could not be used anywhere else because it was part of a uniform program that had either changed or had been terminated. *341 Meeting Transcript*, pp. 32-33.

86.    At some point in 2017, Parker began to evaluate its inventory more carefully. *341 Meeting Transcript*, pp. 32-33.

87.     Parker later determined that an estimated $7 to $10 million of the $22 to $27 million in inventory was un-useable and worthless (the "Obsolete Inventory"). *341 Meeting Transcript*, pp. 32-33.

88.     Parker determined that the Obsolete Inventory effectively eliminated the value of PSU Holdings' equity investment in Parker. *341 Meeting Transcript*, pp. 32-33.

89.     Gillis also testified that PSU Holdings probably did not do their due diligence as well as they should have regarding the Obsolete Inventory. *341 Meeting Transcript*, pp. 32-33.

90.     Accordingly, as of the date of the June 25, 2015 Sale, inventory was overvalued by 25% to 37%.

91.     With the overvaluation of the Obsolete Inventory by $7 to $10 million dollars, Parker was likely insolvent on the day of the June 25, 2015 Sale, and continuously thereafter, as Parker's liabilities exceeded the fair value of its assets from June 25, 2015 until the Petition Date.

92.     Parker, with the overvaluation of the Obsolete Inventory by $7 to $10 million dollars, was undercapitalized from the date of the June 25, 2015 Sale to the Petition Date.

93.     In addition to depleting all of the PSU Holdings invested capital, the Obsolete Inventory, had it been divulged or properly accounted for, would have likely put Parker in default of 5th Frost Amendment and 7th Frost Amendment by over borrowing on their Borrowing Base per the Borrower's Eligible Inventory as those terms are defined in the Frost Bank Loan Agreement, as amended.

94.     A $7 to $10 million reduction in Eligible Inventory would be the equivalent in a reduction in the Borrowing Base by $4.2 to $6 million dollars, depending on the size of the Obsolete Inventory and the seasonal implications as set forth in the 5th and 7th Frost Amendments.

95.    Pike and Porter were part of the Sellers that sold their interests in Parker to PSU Holdings.

96.    Pike was a pre-June 25, 2015 Sale employee of Parker and owner under the Blue Sage ownership group.

97.    Upon information and belief, Pike knew or should have known the quality or amount of Obsolete Inventory as of June 25, 2015.

98.    Pike, as President of PSU Holdings, President of Parker, and a Manager on the Board of Managers, and with a 3.35% equity stake in PSU Holdings, should have communicated his knowledge regarding the Obsolete Inventory to the Defendants and all Parker Insiders.

99.    Likewise, Porter was a pre-June 25, 2015 Sale employee of Parker and owner under the Blue Sage ownership group.

100.    Upon information and belief, Porter knew or should have known the quality or amount of Obsolete Inventory as of June 25, 2015.

101.    Porter, as Vice-President of Sourcing and Secretary of Parker, a "Management Member" under the Holdings Amended LLC Agreement, and with a 1.11% equity stake in PSU Holdings, should have communicated his knowledge regarding the Obsolete Inventory to the Defendants and all Parker Insiders.

102.    Pursuant to Parker's Statement of Financial Affairs ("S.O.F.A.", [D.I. 4]), Balthrope, Vice President of Sales & Marketing, had been with Parker for approximately twenty (20) years, (circa 1997). [D.I. 4,] Part 13, #29.

103.    Upon information and belief, Balthrope knew or should have known the quality or amount of Obsolete Inventory as of June 25, 2015.

104.    Balthrope, as Vice President of Sales & Marketing of Parker, a Management Member under the Holdings Amended LLC Agreement, and a 1.39% equity stakeholder of PSU Holdings, should have communicated her knowledge regarding inventory to the Defendants and all Parker Insiders.

### Failed Expansion and Capital Expenditures

105.    After the June 25, 2015 Sale, the Parker Board consisted of: Adam Norris and Meredith Jolley from Salem, Lane Wiggers and Keven P. Shanahan from Argosy, and Pike.

106.    Board observers consisted of Plexus, Van der Wiel, Sarpa, and Porter.

107.    On April 28, 2016, the Parker Board held a board meeting (the "April 2016 Board Meeting") at the corporate headquarters in Houston.

108.    The April 2016 Board Meeting was attended by Chairman of the Board Adam Norris, Meredith Jolly, Pike, Keven Shanahan, and Lane Wiggers.

109.    Gillis from Salem, and Balthrope, Porter, and Sarpa from Parker were observers attending the April 2016 Board Meeting. Van der Wiel from Parker, and Alex Bean from Plexus attended the April 2016 Board Meeting telephonically.

110.    At the April 2016 Board Meeting the "[b]oard approved the proposed Capital Expenditures for the POS Enhancements, Qless Software Implementation, WiFI Credit Card terminals, Ion Demand Forecasting System Implementation and MARK Stabilization, Enhancements & Mobile Upgrade."

111.    Pike and Van der Wiel were responsible for having the new computer system ERB on line in June of 2017 during summer sale season. *341 Meeting Transcript*, pp. 22-29. The computer system deployed in the fourth quarter of 2016 and went live beginning in May 2017. *Id.* at 25. Parker's enterprise resource planning ("ERP") system on the eve of the 2017

selling season. *Id*. at 25-6. The decision was made to do so even though the Parker Insiders knew the replacement system was not ready to be rolled out. *Id*. at 26.  The new ERP system was predictably an abject failure. *Id*. 23 – 43. Among other things, in the summer of 2017, Parker lost the ability to accurately track inventory and sales, resulting in orders that were either not filled, or filled multiple times. *Id*. at 23. The inability to accurately and timely supply customers with product was a component of PSU's ultimate demise. *Id*. at 23.

112.    After the June 25, 2015 Sale, Pike, as CEO, was responsible for pressure on the sales team to bring in new customers even during the summer sale season, and to "grow effectively at any cost." *341 Meeting Transcript*, p. 35.  In 2017, Parker pushed massive growth at a time when Parker did not have the capability of supporting that growth.

113.    On February 1, 2017, the Parker Board held a board meeting at the corporate headquarters in Houston, Texas (the "February 2017 Board Meeting").

114.    The February 2017 Board Meeting was attended by Board Managers Chairman of the Board Adam Norris, Gillis, Pike, Keven Shanahan and Lane Wiggers. Van der Wiel was an observer as Secretary of the Board for the February 2017 Board Meeting.

115.    Pursuant to the "PSU Holdings, LLC and Subsidiary Consolidated Statement of Operations – TTM", a copy of which is attached hereto as <u>Exhibit M</u>, for the trailing 12 months periods ending April 30, 2017, PSU Holdings' finances reflect the following:

| Sales: | $33,452,338 |
|---|---|
| Cost of Sales: | $12,444,341 |
| Gross Margin: | $21,007,997 |
| Total Operating Expenses: | $21,577,080 |
| Operating Income (Loss): | (569,084) |
| Net Income (Loss): | (3,459,354) |
| EBITDA: | $1,346,017 |
| Total Enterprise Value: | $16,011,436 |

116.    In May 2017, Pike was paid a bonus above salary of $35,802.00.

117.    In May 2017, Balthrope was paid a bonus above salary of $5,200.00.

118.    On June 5, 2017, Parker terminated Pike as Chief Executive Officer. *See* "Waiver and Release of Claims", executed June 6, 2015 (the "Pike Severance Agreement"), Claim No. 312, Desc Attachment 1.

119.    On June 19, 2017, Parker terminated Balthrope as Vice President of Sales. *See* "Revised Separation Agreement, executed August 2, 2017, Claim No. 140, Desc Attachment 2 (the "Balthrope Severance Agreement").

120.    Subsequent to the Pike's firing, at the recommendation of Argosy, Parker hired Eric Plott, a "third-party turnaround guy", as interim CEO of Parker. *See 341 Meeting Transcript*, p 42.

121.    On June 26, 2017, the Parker Board held a telephonic meeting (the "June 2017 Board Meeting").

122.    Attending the June 2017 Board Meeting was Chairman of the Board Adam Norris of Salem, Matthew Erbe of Argosy, and Lane Wiggers of Argosy.  Alex Bean of Plexus, Eric Plott, and Van der Wiel attended as observers.

123.    On July 28, 2017, the Parker Board held a board meeting at the Nashville Airport Marriott Hotel (the "July 2017 Board Meeting").

124.    Attending the July 2017 Board Meeting were Chairman of the Board Adam Norris, Mattew Erbe, Gillis, and Lane Wiggers. Alex Bean of Plexus and Eric Plott joined the July 2017 Board Meeting as observers. Sarpa, Porter, Cindy Jorgensen, and Van der Wiel joined the July 2017 Board Meeting via telephone as observers.

125.    The July 28, 2017 Board Meeting discussed a Financial & IT Report, an update on inventory, the sales organization, and other critical issues.

**Continued Financial Distress – Default and Return Payments**

126.    During the one-year period prior to the Petition Date, Parker was in extreme financial distress with little to no liquidity.

127.    By December 2016, the Investors were already required to invest an additional $1,385,001 in new money in order to obtain the continued use of the Frost Loan under the 7th Frost Amendment.

128.    On May 23, 2017, a $184,850.92 payment made by Parker on its Capital One Corporate Credit Card was reversed. See excerpt of Capital One 06-27-17 Closing Date Statement attached hereto as Exhibit H.

129.    On or before August 2017, Parker escalated paying vendors via its Capital One, N.A. Corporate Card ("Capital One").

130.    Effective August 27, 2017, Parker had a balance on its Captial One credit account in the amount of $1,120,620.86 with a payment due by September 21, 2017. See excerpt of Capital One 08-27-17 Closing Date Statement attached hereto as Exhibit I.

131.    On September 20, 2017, Parker made "WEB Transfers" in the amount of $1,120,620.86 to Capital One (the "September 2017 CapOne Payment"). See excerpt of Capital One 09-27-17 Closing Date Statement attached hereto as Exhibit J.

132.    On September 25, 2017, the September 2017 CapOne Payment was reversed. *Id*.

133.    In October 2017, Capital One indicated they were going to significantly reduce the size of the credit line to $100,000 or $200,000. *341 Meeting Transcript*, p. 52. Thereafter, Capital One reduced its $2.5 million line of credit to Parker to $650,000 then to $125,000. See excerpts of Capital One 11-27-17 Closing Date Statement and Capital One 12-27-17 Closing Date Statement attached hereto as Exhibit K and Exhibit L, respectively.

134.    On or before October 3, 2017, Parker was in default on 7th Frost Amendment.

135.    On October 4, 2017, Frost Bank sent its "Notice of Default, Demand for Cure, Notice of Intent to Accelerate" regarding a "Specified Default" (the "Notice of Default"), stating "Lender hereby notifies Borrower that the Specified Default has occurred and is continuing under the Loan Agreement and the other loan documents." See [D.I. 23-1, pp. 88-90.]

136.    The "Specified Default" as set forth in the Notice of Default was identified as Parker's failure to comply with the Loan Rest Covenant of the 7th Frost Amendment. [D.I. 23-1, pp. 88-90.]

137.    Pursuant to the Notice of Default, Frost Bank gave Parker a cure date of November 3, 2017. [D.I. 23-1, pp. 88-90.]

138.    On November 6, 2017, Frost Bank sent Parker a "Notice of Event of Default, Notice of Acceleration, Notice of Imposition of Default Interest Rate and Reservation of Rights" (the "Notice of Event of Default"). See [D.I. 23-1, pp. 92-96.]

139.    Gillis of Parker testified "…once the bank pulled their support, which is what we had historically relied upon, there was really very little hope of – of getting the business back to the next season." *341 Meeting Transcript*, p. 44.

**Post-Default Actions by Investors**

140.    Parker gambled on a dual-pronged risky strategy of rapid growth at all costs and the implementation of the new ERB computer system (including the shutdown of its old computer system) during the height of its primary selling season.

141.    This strategy failed. Parker's 2017 gross revenue was $27,708,053.00, compared to gross revenue of $33,993,833.00 in 2016. *S.O.F.A*, p. 5,

142.    Parker's failed execution, along with the failure to perform due diligence and accurately value or account for the Obsolete Inventory, resulted in Parker having reduced revenue, as well as being over-leveraged, undercapitalized, short of cash, and unable to obtain financing from conventional sources.

143.    Due to the Obsolete Inventory, Parker was likely insolvent from the closing of the June 25, 2015 Sale.

144.    In July of 2017, Parker failed to make a payment to Argosy, Salem, and Plexus for the interest on their Subordinated Notes. Salem did not receive a payment for interest in September and October 2017.

145.    Parker's insolvency culminated with the Notice of Default from Frost Bank on November.

146.    Argosy, Salem, and Plexus knew no later than November of 2017 that Parker was insolvent.

147.    Argosy, Salem and Plexus were trying to hold on to Parker to sell Parker to a third party to payoff the debt and maybe some equity. *341 Meeting Transcript*, pp. 45-48.

148.    Having defaulted on the Frost Bank Loan and with its credit line with Capital One significantly reduced, the Investors were forced to advance the Argosy, Salem, and Plexus Nov. 2017 Notes.

149.    As Frost Bank had already a year prior required the Investors to advance significant equity infusions to maintain a credit line, the Argosy, Salem, and Plexus Nov. 2017 Notes were additional "loans" to Parker that no prudent, *bona fide* lender would ever make.

150.    Being in default of the Frost Bank Loan, and without the ability to obtain financing from conventional sources, the Investors advanced the Argosy Nov. 2017 Notes, the Salem LP Nov. 2017 Notes, and the Plexus LP Nov. 2017 Notes.

151.    The Argosy, Salem LP, and Plexus LP Nov. 2017 Notes were issued despite Parker's failure to pay interest on the previously issued Subordinated Notes.

**Specific Transfers For Interest on Subordinated Notes and Equity Subject to Avoidance**

152.    The Argosy entities combined received $134,240.05 during the Insider Preference Period from January 13, 2017 through the Petition Date (collectively, the "One-year Transfers"):

    a.    $124,707.25 to or for the benefit of Argosy Partners during the Insider Preference Period; and

    b.    $9,531.91 to or for the benefit of Argosy Parallel during the Insider Preference Period.

*See* S.O.F.A., #4.1; *see also* Exhibit A.

153.    The Argosy entities combined received $424,230.83 during the 548 Transfer Period received from January 13, 2016 through the Petition Date (collectively, the "548 Transfers"):

    a.    $377,390.72 to or for the benefit of Argosy Partners during the 548 Transfer Period; and

    b.    $46,813.17 to or for the benefit of Argosy Parallel during the 548 Transfer Period.

*See* S.O.F.A., #4.1; *see also* Exhibit A.

154.    The Argosy entities combined received $515,918.73 during the Delaware Code Four Year Transfer Period from January 13, 2014 through the Petition Date (collectively, the "Del. C. Transfers"):

      a.    $462,284.50 to or for the benefit of Argosy Partners during Delaware Code Four Year Transfer Period, and

      b.    $53,598.05 to or for the benefit of Argosy Parallel during the Delaware Code Four Year Transfer Period.

*See* S.O.F.A., #4.1; *see also* <u>Exhibit A</u>.

155.    Each of the above-referenced Transfers were payments made on the obligations to pay to Argosy the interest on the Subordinated Notes (the "Obligations").

156.    The Plaintiff reserves his right to include, amend, avoid and recover pursuant to the following causes of action, any transfers for interest on Defendants' subordinated notes the Defendants received from June 25, 2015 through December 31, 2017 which would be part of the Additional Transfers.

157.    During the course of this adversary proceeding the Plaintiff may learn (through discovery or otherwise) of additional transfers, payments of interest on the Subordinated Notes to the Defendants from June 25, 2015 through the Petition Date (the "Additional Transfers"), during the Insider Preference Period, the 548 Transfer Period, and/or the Delaware Code Four Year Transfer Period, it is the Plaintiff's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property or for the benefit of the Defendants or any other transferee.

158.    Thus, the Plaintiff reserves his right to amend this Complaint as to include: further information on the Transfers, for further information on the Additional Transfers, revision of

Defendants' names, additional defendants, and/or additional causes of action (*i.e.*, but not exclusively, 11 U.S.C. §542, §545, §548 and §544 and 6 Del. C. §§ 1304(a)(2), 1305(a), and 1305(b) and 11 U.S.C. § 550) (collectively the "Amendments"), that may become known to the Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## CLAIMS FOR RELIEF

### COUNT I
### Avoidance of One-Year Transfers - 11 U.S.C. § 547(b)

159.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

160.    On or within one-year prior to the Petition Date, the Debtor continued to operate its business affairs, including the transfer of property, either by checks, cashiers' checks, wire transfers, electronic debit, direct deposits, or Capital One, N.A. credit card transfers or otherwise to certain entities, including the Defendants.

161.    The One-year Transfers constitute payments on Obligations to or for the benefit of the Defendants for the interest on the Argosy Subordinated Notes.

162.    The Argosy entities combined received $134,240.05 in One-year Transfers:

      a.     $124,707.25 to or for the benefit of Argosy Partners during the Insider Preference Period; and

      b.     $9,531.91 to or for the benefit of Argosy Parallel during the Insider Preference Period.

*See* S.O.F.A., #4.1; *see also* <u>Exhibit A</u>.

163.    Defendants are "insiders" of the Debtor, as that term is defined pursuant to 11 U.S.C. section 101(31)(B), or at minimum a non-statutory insider.

164.    Defendants were creditors of the Debtor at the time of the One-year Transfers within the meaning of 11 U.S.C. § 101(10)(A).    At the time of the One-year Transfers, Defendants had a right to payment on account of the Obligations owed to Defendants.

165.    The One-year Transfers were to or for the benefit of creditor Defendants because each One-year Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor.

166.    The One-year Transfers were for, or on account of, antecedent debt(s) owed by the Debtor before such One-year Transfers were made.

167.    The Debtor was insolvent at all times during the ninety (90) days prior to the Petition Date.    Plaintiff is entitled to the presumption of insolvency for each Transfer made during the 90-day Preference Period pursuant to 11 U.S.C. § 547(f).

168.    The Debtor was insolvent at all times during the one-year Insider Preference Period.

169.    As a result of the One-year Transfers, Defendants received more than they would have received if: (i) this case was under chapter 7 of the Bankruptcy Code; (ii) the One-year Transfers had not been made; and (iii) Defendants received payment of such antecedent debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying bankruptcy case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point the unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy Estate.

170.    In accordance with the foregoing, the One-year Transfers are avoidable pursuant to 11 U.S.C. § 547(b).

**COUNT II**
**Avoidance of Constructive Fraudulent Transfers - 11 U.S.C. 548(a)(1)(B)**

171.    The Plaintiff repeats and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

172.    The 548 Transfer Period consists of the two-year period immediately prior to the Petition Date.

173.    The Argosy entities combined received $424,230.83 during the 548 Transfer Period, as follows:

a.    $377,390.72 to or for the benefit of Argosy Partners during the 548 Transfer Period; and

b.    $46,813.17 to or for the benefit of Argosy Parallel during the 548 Transfer Period.

*See* S.O.F.A., #4.1; *see also* Exhibit A.

174.    The 548 Transfers are an interest of the Debtor in property.

175.    Argosy was the controlling shareholder, with a combined 52.83 percent equity interest in the Debtor and had two of the five members on the Board of Managers at the time the 548 Transfers were made.

176.    Argosy was in control of the Debtor at the time the 548 Transfers were made.

177.    Defendants are "insiders" of the Debtor, as that term is defined pursuant to 11 U.S.C. section 101(31)(B), or at minimum a non-statutory insider.

178.    The Debtor made and Defendants received the 548 Transfers from the Debtor on or within two years prior to the Petition Date.

179.    The Debtor voluntarily or involuntarily paid the 548 Transfers through the control of insider Defendants.

180.    The Debtor received less than reasonably equivalent value in exchange for the 548 Transfers.

181.    Defendants received and benefited from the 548 Transfers from the Debtor.

182.    On the dates the 548 Transfers were made, the Debtor was insolvent or became insolvent as a result of such 548 Transfers.

183.    On the dates of the 548 Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital. Contemporaneous with the 548 Transfers the Debtor: possessed $7 to $10 million of obsolete, un-useable, and worthless inventory; had either incorrect or invalid financial information per the Dixon Hughes audit; incurred a financial loss in 2016; had rejected or Reversed payments to creditors; failed to make its monthly payments in July 2017 on the interest of the Subordinated Notes, and Parker's finances were leading it to a default of 5th and 7th Frost Amendment.

184.    On the dates of the 548 Transfers, the Debtor intended to incur, or believed that it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

185.    The Trustee avers that at the time that Defendants received the 548 Transfers from the Debtor, the Debtor was unable to pay its debts as they came due from at least May 1, 2017.

186.    The Trustee is entitled to avoid the 548 Transfers and/or Obligations pursuant to 11 U.S.C. §§ 548(a)(1)(B)(i) and (ii)(I), (II) and (III).

## COUNT III
### Avoidance of Constructive Fraudulent Transfers -11 U.S.C. § 544 & 6 Del. C. § 1304(a)(2)

187.    The Plaintiff repeats and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

188.    The Bankruptcy Code, pursuant to section 544(b) states in pertinent part that "… the Trustee may avoid any transfer of an interest of the debtor in property… that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title…".

189.    The Del. C. Transfers were made on or within four years of the date of the Complaint and/or during the Delaware Code Four Year Transfer Period from January 13, 2014 to January 12, 2018, as identified on Exhibit A.

190.    The Del. C. Transfers are an interest of the Debtor in property.

191.    The Argosy entities combined received $515,918.73 during the Delaware Code Four Year Transfer Period from January 13, 2014 through the Petition Date:

   a.    $462,284.50 to or for the benefit of Argosy Partners during Delaware Code Four Year Transfer Period, and

   b.    $53,598.05 to or for the benefit of Argosy Parallel during the Delaware Code Four Year Transfer Period.

See S.O.F.A., #4.1; see also Exhibit A.

192.    Defendants authorized, made, received, and benefited from the Del. C. Transfers from the Debtor.

193.    The Debtor voluntarily or involuntarily paid the Del. C. Transfers through the control of the insider Defendants and received less than reasonably equivalent value in exchange for the Del. C. Transfers.

194.    Defendants received and benefited from the Del. C. Transfers.

195.    The Debtor was insolvent on the dates that all Del. C. Transfers were made to the Defendants or became insolvent as a result of such Del. C. Transfers on the dates the Del. C. Transfers were made to the Defendants.

196.    On the dates of the Del. C. Transfers, the Debtor was engaged in a business or transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital. Contemporaneous with the 548 Transfers the Debtor: possessed $7 to $10 million of obsolete, un-useable, and worthless inventory; had either incorrect or invalid financial information per the Dixon Hughes audit; incurred a financial loss in 2016; had rejected or Reversed payments to creditors; failed to make its monthly payments in July 2017 on the interest of the Subordinated Notes, and Parker's finances were leading it to a default of 5th and 7th Frost Amendment.

197.    At the time each of the Del. C. Transfers were made, the Defendants intended for the Debtor to incur, or believed or reasonably should have believed that the Debtor would be left with unreasonably small capital and would incur, debts that would be beyond the Debtor's ability to pay as such debts became due.

198.    At the time each of the Del. C. Transfers were made, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

199.    The Del. C. Transfers consisted of transfers made by the Debtor for the benefit of the Defendants and caused the Debtor's other obligations to go unsatisfied.

200.    The Debtor has creditors whose claims arose before the Del. C. Transfers were made.

201.    The Del. C. Transfers caused the unsecured creditors of the Debtor to be harmed by rendering the Debtor unable to pay its debts.

202.    Each of the Del. C. Transfers is avoidable under 6 Del. C. § 1304(a) of the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301 *et. seq*. (the "Delaware UFTA") by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

203.    The Del. C. Transfers are voidable transfers pursuant to the section 1304(a)(2) of the Delaware UFTA as made applicable pursuant to section 544(b)(1) of the Bankruptcy Code based on lack of reasonably equivalent value.

**COUNT IV**
**Avoidance of Constructive Fraudulent Transfers - 11 U.S.C. § 544 & 6 Del. C. § 1305(a)**

204.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

205.    The Bankruptcy Code, pursuant to section 544(b) states in pertinent part that "… the Trustee may avoid any transfer of an interest of the debtor in property… that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title…".

206.    The Argosy entities combined received $515,918.73 during the Delaware Code Four Year Transfer Period from January 13, 2014 through the Petition Date:

      a.    $462,284.50 to or for the benefit of Argosy Partners during Delaware Code Four Year Transfer Period, and

      b.    $53,598.05 to or for the benefit of Argosy Parallel during the Delaware Code Four Year Transfer Period.

*See* S.O.F.A., #4.1; *see also* Exhibit A.

207.    The Del. C. Transfers were made on or within four years of the date of the Complaint and/or during the Delaware Code Four Year Transfer Period from January 13, 2014 to January 12, 2018, as identified on Exhibit A.

208.    The Del. C. Transfers are an interest of the Debtor in property.

209.    The Debtor received less than reasonably equivalent value in exchange for the Del. C. Transfers.

210.    The Debtor was insolvent on the dates that all Del. C. Transfers were made to the Defendants, or the Debtor became insolvent as a result of the Del. C. Transfers.

211.    The Del. C. Transfers were paid on obligations to or for the benefit of the Defendants for the interest on the Argosy Subordinated Notes.

212.    Defendants authorized, made, received, and benefited from the Del. C. Transfers.

213.    The Debtor has creditors whose claims arose before the Del. C. Transfers were made.

214.    The Del. C. Transfers caused the unsecured creditors of the Debtor to be harmed by rendering the Debtor unable to pay its debts.

215.    Under section 1305(a) of the Delaware UFTA, each of the Del. C. Transfers is avoidable by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

216.    The Del. C. Transfers are voidable transfers pursuant to section 1305(a) of the Delaware UFTA as made applicable pursuant to section 544(b)(1) of the Bankruptcy Code based on lack of reasonably equivalent value.

## COUNT V
**Avoidance of Constructive Fraudulent Transfers 11 U.S.C. §544 & 6 Del. C. §1305(b)**

217.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

218.    The Bankruptcy Code, pursuant to § 544(b) states in pertinent part that "… the Trustee may avoid any transfer of an interest of the debtor in property… that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 502 of this title…".

219.    At the time the Defendants became entitled to the One-year Transfers, Defendants were insiders of the Debtor within the meaning of the definition at 6 Del. C. §1301(7)(b), (c), or (d), and §1301(1).

220.    The One-year Transfers are an interest of the Debtor in property.

221.    The Defendants received and benefited from the One-year Transfers from the Debtor.

222.    The Argosy entities combined received $134,240.05 in One-year Transfers:

a.    $124,707.25 to or for the benefit of Argosy Partners during the Insider Preference Period; and

b.    $9,531.91 to or for the benefit of Argosy Parallel during the Insider Preference Period.

*See* S.O.F.A., #4.1; *see also* Exhibit A.

223.    The One-year Transfers constitute payments on Obligations to or for the benefit of the Defendants for the interest on Defendants' Subordinated Notes.

224.    In July of 2017, Parker failed to make a payment to Argosy, Salem, and Plexus for the interest on their Subordinated Notes. Salem did not receive a payment for interest in

September and October 2017, and Argosy, Salem, and Plexus did not receive payments for interest in November and December 2017, and January 2018.

225.    The Debtor was insolvent at the time of the One-year Transfers or became insolvent as a result of the One-year Transfers.

226.    At the time of the One-year Transfers, the Defendants had reasonable cause to believe that the Debtor was insolvent.

227.    At the time of the One-year Transfers, the Debtor's debts were greater than all of the Debtor's assets, at a fair valuation.

228.    At the time of the One-year Transfers, the assets and enterprise value of the Debtor was significantly less than the liabilities.

229.    At the time of, and prior to, the One-year Transfers, the Debtor had not been paying its debts as they came due.

230.    The Debtor has creditors whose claims arose before the One-year Transfers were made or Obligations were incurred.

231.    The One-year Transfers caused the unsecured creditors of the Debtor to be harmed by rendering the Debtor unable to pay its debts.

232.    Under Section 1305(b) of the Delaware UFTA, each of the One-year Transfers is voidable by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code.

233.    The One-year Transfers are avoidable transfers pursuant to section 1305(b) of the Delaware UFTA as made applicable pursuant to § 544(b)(1) of the Bankruptcy Code.

## COUNT VI
### Recovery of Avoided Transfers - 11 U.S.C. § 550 & 6 Del.C. § 1307

234.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

235.    Trustee is entitled to avoid the Transfers pursuant to 11 U.S.C. §§ 547, 548, 544(b) and 6 Del. C. §§ 1304 and 1305.

236.    The Defendants were the initial transferee of the Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfers were made.

237.    Pursuant to 11 U.S.C. § 550(a) and 6 Del. C. § 1307, the Plaintiff is entitled to recover from the Defendants the Transfers, plus interest thereon to the date of payment and the costs of this action.

## COUNT VII
### Recharacterization of Debt to Equity -- Argosy Nov. 2017 Notes

238.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

239.    Pursuant to the Bankruptcy Court's authority to recharacterize claims, the Plaintiff alleges that the Argosy Nov. 2017 Notes should be recharacterized from debt to equity.

240.    The Argosy Nov. 2017 Notes, while asserted as a debt owed to Defendants by Parker, were actually equity contributions and should be recharacterized as such. The facts as alleged above and incorporated herein by reference support the recharacterization of the Argosy Nov. 2017 Notes as equity.

241.    For the Argosy Nov. 2017 Notes, Defendants acted as both lender and equity investors.

242.    On or about November 8, 2017, the insiders Plexus, Argosy, and Salem contributed $463,058.00 in funds (the "Nov. 8th Funding") to the Debtor. The Argosy Nov. 2017 Notes and the funds advanced thereunder represent approximately 59.9% of the Nov. 8th Funding.

243.    At the time of the Nov. 8th Funding, Defendants owned approximately 52.83% of the equity of Parker. At the time of the June 25, 2015 Sale, Defendants owned 43.63% of the equity of Parker.

244.    The Nov. 8th Funding was advanced substantially in proportion to the amounts of equity invested by each of Plexus, Argosy, and Salem.

245.    At the time of the Nov. 8th Funding, Parker was aware that it had undervalued inventory by $7 to $10 million dollars, resulting in the Debtor's liabilities far exceeding its assets.

246.    At the time of the Nov. 8th Funding, Parker and the Defendants were aware that the enterprise value of Parker was significantly less than its debts, including the Frost Loan and the Subordinated Notes.

247.    At the time of the Nov. 8th Funding, Parker was insolvent, undercapitalized, and in continual breach of the financial covenants of the 5th and 7th Frost Amendments regarding the ratios of inventory and the Borrowing Base.

248.    At the time of the Nov. 8th Funding, Frost Bank had already declared Parker to be in default of the Loan Rest Covenant of the 7th Frost Amendment, and was in default of the Frost Loan Agreement.

249.    Prior to the Nov. 8th Funding, in conjunction with the 7th Frost Amendment on December 15, 2016, Frost Bank as secured lender had already required Argosy and the other equity investors to invest an additional $1,385,000 in funds.

250.    As such, nearly a year prior to the Nov. 8th Funding, Parker was unable to extend existing credit facilities without significant equity investments.

251.    Upon information and belief, Parker was unable to obtain alternative financing in November 2017, after the Frost Bank Notice of Event of Default.

252.    Specifically, the Argosy Nov. 2017 Notes were funded when, among other things: (1) the Defendants knew that Parker was insolvent; (2) Frost Bank had declared Parker to be in default of the Frost Loan Agreement; (3) Parker was over-leveraged and insufficiently collateralized, especially after determining the scope of the Obsolete Inventory; and (4) knew that no prudent lender would extend additional credit to Parker under these circumstances.

253.    Nov. 8th Funding was a last-ditch effort to salvage any equity value while the Investors were seeking the sale of Parker to a third party.

254.    Upon information and belief, Parker and Defendants failed to comply with the formalities of a loan between lender and a creditor.

255.    Upon information and belief, under the Frost Loan Agreement, as amended, Parker was prohibited from issuing additional promissory notes to the Defendants.

256.    At the time of the Nov. 8th Funding, Parker did not have any unsecured collateral that Parker could provide to Defendants to secure repayment of funds advanced under the Argosy Nov. 2017 Notes.

257.    Upon information and belief, an unaffiliated *bona fide* lender, would not act in the same manner as Defendants making an unsecured loan without collateral to an insolvent entity.

258.    Consequently, because the true nature of the funds advanced under the Argosy Nov. 2017 Notes is one of an equity contribution rather than one creating a debt, the Argosy Nov. 2017 Notes should be recharacterized as equity.

## COUNT VIII
### Avoidance of Obligations Incurred Under the Subordinated Notes
### 11 U.S.C. §544 and 6 Del. C. §§ 1304(a)(2) and 1305(a)

259.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

260.    On June 25, 2015, the Plexus, Salem, and Argosy, as Subordinated Note Holders and Investors, consummated the June 25, 2015 Sale.

261.    The June 25, 2015 Sale was not an asset sale of the Debtor, rather PSU Holdings' purchase of all membership interests in the Debtor from the non-Debtor Sellers.

262.    According to the Dixon Hughes Financial Statement, PSU Holdings' cash consideration and Purchase Price for the membership interests in Parker was $20,601,750.

263.    Upon information and belief all cash consideration from the June 25, 2015 Sale went to the Sellers or Frost Bank for the payment of certain term loans.

264.    According to the Dixon Hughes Financial Statement, the Purchase Price included:

    a.  Inventory:           $27,117,532
    b.  Goodwill:            $10,537,021
    c.  Other Assets:         $3,501,998
    d.  Line of Credit:      ($16,057,079)
    e.  Other Liabilities:    ($4,497,722)

265.    Due to the Obsolete Inventory in the amount of $7 to $10 million, all or most of the Goodwill and therefore equity that PSU Holdings had in Parker was extinguished immediately.

266.    Notwithstanding receiving no consideration through the June 25, 2015 Sale, Parker guaranteed (the "Guarantee Obligations") all amounts funded to non-Debtor PSU Holdings via the Subordinated Notes.

267.    As a result of these Guarantee Obligations, Parker became potentially liable for all amount due under the Subordinated Notes to the sum of $13,500,000 plus interest payments in excess thereof.

268.    Parker did not receive reasonably equivalent value in exchange for the Guarantee Obligations.

269.    Due to the Obsolete Inventory and the Guarantee Obligations, Parker was engaged or about to engage in a business or transaction for which the remaining assets of Parker were unreasonably small in relation to the business or transaction.

270.    Due to the Obsolete Inventory and the Guarantee Obligations, Parker intended to incur, or believed or reasonably should have believed that Parker would incur, debts beyond Parker's ability to pay as they came due.

271.    Due to the Obsolete Inventory and the Guarantee Obligations, Parker was insolvent or rendered insolvent as a result of the Guarantee Obligations.

272.    Pursuant to 6 Del. C. § 1304(a)(2), the Guarantee Obligations and Subordinated Notes, to the extent the Subordinated Notes constitute obligations of Parker, are fraudulent as to Parker's creditors.

273.    Pursuant to 6 Del. C. § 1305(a), the Guarantee Obligations and Subordinated Notes, to the extent the Subordinated Notes constitute obligations of Parker, are fraudulent as to Parker's creditors.

274.    The Guarantee Obligations, as well as all payments made under the Guarantee Obligations and Subordinated Notes, including the Obligation to make payments on any interest and/or principal, should be avoided.

## COUNT IX
### Disallowance of all Claims - 11 U.S.C. § 502(d) and (j)

275.    The Plaintiff hereby incorporates all preceding paragraphs as if fully re-alleged herein.

276.    The Defendants are entities from which property is recoverable under 11 U.S.C. § 550 of the Bankruptcy Code.

277.    The Defendants are transferees of the Transfers avoidable under 11 U.S.C. §§ 547, 548, and/or 544(b) and 6 Del C. §§ 1304 and/or 1305.

278.    The Defendants have not paid the amount of Transfers, or turned over such property, for which the Defendant are liable under Section 550 of the Bankruptcy Code.

279.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of the Defendants against the Estate or the Plaintiff must be disallowed until such time as the Defendants pay to the Plaintiff an amount equal to the aggregate amount of all the Transfers, plus interest thereon and costs.

280.    Pursuant to 11 U.S.C. § 502(j), any and all Claims of the Defendant, and/or its assignee, against the Estate or the Plaintiff previously allowed by the Debtor or the Plaintiff, must be reconsidered and disallowed until such time as the Defendants pay to the Plaintiff an amount equal to the aggregate amount of all the Transfers.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests that this Court grant him the following relief against Defendants:

A.      Avoiding the Transfers pursuant to 11 U.S.C. §§ 547, 548, and/or 544(b) of the Bankruptcy Code and 6 Del C. §§ 1304 and/or 1305(a) and/or (b); and

B.      Avoiding the Guarantee Obligations 6 Del C. §§ 1304 and/or 1305; and

C.      Granting judgment in favor of the Plaintiff against the Defendants in an amount of $515,918.73 (the "Judgment Amount");

D.      Requiring the Defendants to immediately to pay the Judgment Amount to the Plaintiff pursuant to 11 U.S.C. § 550(a) and 6 Del.C. § 1307;

E.      Disallowing pursuant to 11 U.S.C. § 502 any Claims of the Defendants, and/or their assignees, if Defendants refuse to turn over any transfers to the Plaintiff;

F.      Awarding pre-judgment and post judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

G.      Granting the Plaintiff such other and further relief as the Court deems just and proper.

COOCH AND TAYLOR, P.A.

 /s/ Robert W. Pedigo
Robert W. Pedigo (#4047)
R. Grant Dick (#5123)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE   19899-1680
Telephone: (302) 984-3832
Fax: (302) 984-3939
E-mail: rpedigo@coochtaylor.com
E-mail: gdick@coochtaylor.com

and

Patrick J. Coffin, Esquire
Elliott, Thomason & Gibson, LLP
2626 Cole Ave., Suite 600
Dallas TX 75204
214.377.4848 Tel
214.377.4858 Fax
patrick@etglawfirm.com

and

Steven D. Sanfelippo, Esquire
Cunningham Swaim, L.L.P.
7557 Rambler Road
Suite 440
Dallas, Texas 75231
Telephone: (214) 646-1495
Facsimile: (214) 613-1163
ssanfelippo@cunninghamswaim.com
rcunningham@cunninghamswaim.com

*Special Counsel for Jeoffrey L. Burtch, Chapter 7
Trustee of Parker School Uniforms, LLC*

November 7, 2019